### Case No. 4,556.

EVANS et al. v. The CHARLES.

[1 Newb. 329.] [1]

District Court, D. Louisiana. Nov., 1842.

J. T. Preston and C. Roselius, for libelants.
J. P. Benjamin, for respondents.

McCALEB, District Judge. This is a libel for salvage against the ship Charles, found derelict at sea, on the 4th of June last, about eighteen miles from South Point light-house, at the Balize, by the captain of the tow-boat Tiger. At the time she was discovered, she had all her sails set, and was apparently standing in towards the Balize. She had on board a cargo of lumber and staves, but was entirely abandoned. It appears that she left this port about the first of June last, under the command of a Captain Gorham, bound for the port of Bordeaux in France: that she had proceeded on her voyage about forty miles from the Balize, when she was abandoned by the master, crew and passengers under the belief that she was sinking. The ship Louis Quatorze was sailing within a

---

[1] [Reported by John S. Newberry, Esq.]

short distance of the Charles, at the time the determination to desert the latter was formed, and a signal being given, the master of the Louis Quatorze went to the assistance of the passengers on board the Charles and received them all on his own vessel. The master and crew of the Charles afterwards hailed and got on board a vessel bound to the port of Charleston; and the passengers pursued their voyage to France. With the ill-grounded apprehensions which led to the abandonment of the vessel to the mercy of the winds and waves, without a single human being on board, I have fortunately, so far as Capt. Gorham and his crew are concerned, nothing to do in passing an opinion upon the merits of the case; and I willingly take leave of this part of the evidence with the single remark that there seems to be not the slightest justification for the course of conduct they pursued. For, admitting that the vessel was making water and was thus rendered unseaworthy and insufficient to encounter the dangers of so long a voyage, it is yet fully established by the testimony of several intelligent and respectable witnesses, whose knowledge of nautical affairs cannot be questioned, that it was not only not probable, but not possible for the ship to have gone down with such a cargo as she then had on board. The plain, nay, the only course which honesty and the most ordinary knowledge of nautical affairs would have suggested, was to return immediately to the port of departure, where the vessel could have been refitted and again dispatched upon her voyage. Capt. Kroll of the tow-boat Tiger, which went to the relief of the derelict vessel, states that on hailing her and seeing no one on board, he ordered the crew of the tow-boat to go on board of her and examine her hold and cabin: that they refused to go, but that Mr. Clarke, the pilot, finally complied with his request, and found upon examination that the baggage of the passengers and crew, as well as the bedding, had been removed, and that everything had been taken out of her except a small quantity of stores, and the cargo of staves and lumber, which has already been mentioned. The captain of the Tiger proceeds to say, that believing that the crew and passengers had either deserted her from apprehensions that she was sinking (his pilot having reported that she had thirty inches of water in her hold), or had been taken by pirates, he looked in every direction to see if he could find anything which could solve the doubts which hung upon his mind, and finally descried a small boat, which he immediately approached and found on board of it a dog. After cruising about in different directions for two or three hours, he returned to the Charles and took her in tow: that in returning to the Balize he encountered a severe gale, which lasted three-quarters of an hour. This gale, he thinks, would have driven the Charles ashore about 9 or 10 o'clock that night, had she not been relieved.

He states that he was engaged forty-eight hours in towing her with two other vessels up to the city: that he hired six hands on board the ship Powhattan to go on board of her and pump her; and that these hands were engaged one-third of the time in working one pump. The reason that he employed the hands on board the Powhattan, was the positive refusal on the part of the crew of the tow-boat Tiger to have anything to do with the Charles. They declined in the first instance, to go on board of her to examine her, and refused to pump her, because they said they were not paid for pumping out other ships or vessels than the one upon which they were employed. According to the testimony of Captain Kroll, it appears that the crew of the tow-boat Tiger did nothing but their ordinary duties on board their own vessel, which is employed in towing vessels from the sea up to this port: that all the assistance he received, in saving the Charles, was derived from the meritorious exertions of his pilot, Mr. Clarke, the six men hired on board the Powhattan, and two other men whose names are not given and not remembered either by himself or Mr. Clarke, who was also examined as a witness on behalf of the intervening libelants, Clark, Grant and others, owners of the tow-boat Tiger. There is not a tittle of evidence to show whether or not these two men are of the number of the crew who appear as the original libelants. The testimony of Clarke, the pilot, coincides almost entirely with that of Captain Kroll, and especially with that part of it which relates to the refusal of the crew of the tow-boat, to aid in rendering relief to the Charles. They both say that the service they themselves rendered the derelict ship, was performed in the regular discharge of their accustomed duties, in towing vessels from the sea to this port, and they modestly refuse to receive any extra compensation, or to assert any claim for salvage. They also state that the tow-boat was subjected to an inconsiderable delay by the service rendered to the Charles, and that they were not prevented from bringing up other vessels as usual.

From a candid and impartial view of this testimony, I have no difficulty in coming to the conclusion, that the claim of the original libelants for salvage, should be dismissed. They have not only failed to show that they have rendered any service out of the line of their regular duty, as the crew of the tow-boat Tiger, but it is very clear from the testimony given, which is entirely disinterested, that they refused to render the very service for which they now demand a salvage compensation. The same must be said of the claim of the intervening libelants, Simon Peterson, the carpenter, Levi Sprinkle, first engineer, Augustus Ducoing, second engineer, and James M. Brown, the mate on board the Tiger; for there is nothing in the evidence to show that they performed a single act out of the line of their ordinary duty.

They neither said nor did anything which indicated a wish or disposition to co-operate with the captain and pilot in their laudable efforts to bring the derelict vessel out of danger. The remark of the proctor at the bar, that the occupation of an engineer is such, that it would have been impossible for him with safety to the tow-boat, to have abandoned his post, is all very true; but it might with the same propriety be made with reference to the pilot or the fireman, who had each their separate and peculiar duties to perform, and we cannot say that because they could not do an act, that therefore they should be rewarded for its performance by another, when it is not shown that there was even a wish expressed, or a disposition exhibited, to render the service desired. In reply to the question, what is a salvor? Lord Stowell, in the case of The Neptune, 1 Hagg. Adm. 227, replies that "it is a person who without any particular relation to a ship in distress, proffers useful service, and gives it as a volunteer adventurer, without any pre-existing covenant that connected him with the duty of employing himself for the preservation of that ship." Now there is nothing in the evidence to show that any of these intervening libelants either proffered or gave any useful service to this derelict vessel, and I have no hesitation in saying that their claim for salvage is without foundation, and ought to be dismissed.

I am now to consider the claim of the owners of the Tiger, who also appear here as intervening libelants; and my attention is first called to the ingenious remarks of the counsel of the respondents, as to their right to be recognized as salvors at all. The definition of the term "salvor," just quoted from Lord Stowell, has reference to one who claims to be considered as such, from an active participation in the service and peril for which he expects to be rewarded. But there are others, who had been repeatedly regarded by our ablest admiralty judges, as entitled to share in the quantum of salvage. On this point, I need only quote from the decision of Judge Story, in the case of The Henry Ewbank [Case No. 6,376]: "The owners, then, have a just claim to share in the salvage in all cases, where their property is put at risk, in effecting the salvage service." And again, he continues: "But the law does not stop short with a mere allowance to the owner of an adequate indemnity for the risk so taken. It has a more enlarged and a higher aim. It looks to the common safety and interest of the whole commercial world, in cases of this nature; and it bestows upon the owner a liberal bounty and reward to stimulate him to a just zeal in the common cause, and not to clog his voyages with narrow instructions, which should interdict his master from any salvage service. If a bare compensation for loss and risk were allowed, what motive could any owner have to suffer his voyage to be retarded, his just expecta-

tions of profit to be frustrated, his whole commercial arrangements to be suspended upon risks, which he could neither foresee nor guard against by any common prudence? The law has a wise regard to considerations of this nature; and it offers, not a premium of indemnity only, but an ample reward, measured by an enlightened liberality and forecast. While I agree with Lord Stowell, 'that the master and crew are, in strict language, the only salvors,' I cannot agree to the justice of the remark, 'that the owners in general have no great claim; as to labor and danger, none;' and that they come in only upon the equitable consideration of the court, for damage or risk which their property might have incurred. This latter remark is not borne out by the subsequent practice of that eminent judge; for he has been liberal in awarding salvage to the owners. I can, with far more satisfaction, unite in the opinion of Mr. Chief Justice Marshall, in speaking on this subject in the great case of Mason v. The Blaireau, 2 Cranch [6 U. S.] 269, where he says: 'The proportion allowed to the owners of the firm' (the saving ship), 'and her cargo, is not equal to the risk incurred; nor does it furnish an inducement to the owners of vessels to permit their captains to save those found at sea, in any degree proportioned to the inducements offered to the captains and crews.' To this," Judge Story continues, "it may be added, that it furnishes a strong inducement to officers and seamen, not to desert their own proper duty to their owner and his interests, for selfish purposes, by making them share only in subordination to, and in connection with those interests." In addition to these high authorities, the communication signed by the counsel of the respondents, proposing a settlement of the claims of the owners and the other libelants, seems to treat and recognize them as entitled to claim salvage. I am clearly of the opinion, therefore, that these owners of the tow-boat are properly before the court, and have a right to receive a compensation and reward for the services rendered by their tow-boat. This compensation or reward is to be accorded, however, upon different principles, and for different reasons than it would be bestowed upon the captain and pilot, were they now urging their claims before the court. There are many facts detailed in the evidence given upon the trial, which must exercise necessarily an important influence upon my mind in decreeing the quantum of salvage. It is clearly established, that a vessel and cargo entirely derelict, has been saved by the captain and pilot of a steamboat, which is employed by the owners in the business of towing vessels from the sea to this port. It is also established, that although the aid by which they were restored to safety, was afforded in weather which was for the most part favorable to the salvors, yet that it was in time to save them from the probable consequences of

a violent gale, which the tow-boat and her charge encountered while steering their course to the Balize; and which in the opinion of Captain Kroll, would in all probability, have driven the former ashore, some time in the course of the following night. In this opinion he is sustained by that of his pilot, Mr. Clarke, who also states, that he considered the gale sufficiently violent to have dismasted the Charles; or if it had struck her with her sails set, as they were when she was discovered by the officers of the tow-boat, to have driven her so far under, stern foremost, that she would have filled. Both of the witnesses seem to be quite confident in the opinion that she would have been driven in a short time by the winds and waves on shore. In such an event, she would, in all probability have been a total loss. To weaken the opinion expressed by these two witnesses on this subject, that of Captain Hernman, was asked by the counsel of the respondents. And although this last witness thought that it was impossible for the ship to have been driven ashore in so short a time as stated by Captain Kroll and the pilot, yet he did not say that it was impossible for her to have shared this fate in a somewhat longer time. Upon this point, I can entertain but little doubt, when I recollect that the master of the Louis Quatorze, stated, that she was abandoned at the distance of forty miles from the Balize, about twenty-four hours before she was discovered, only eighteen miles from the South Point light-house.

I will conclude my view of this part of the case by another quotation from the able decision of Judge Story in the case of The Henry Ewbank [supra], which I am induced to insert here by a remark which fell from the counsel of the respondents, to the effect that the ship was lying in the track of vessels passing to and from the Balize, and would, in all probability, have been discovered and brought in by some other vessel if she had not been relieved by the Tiger. "We are not," says Judge Story, "to indulge mere possible conjectures on such subjects. The fact that she was saved is clear; the presumption that she might otherwise have been saved, during this long period, is mere matter of conjecture, in nubibus. It is not the habit of any court of justice to yield themselves up, in matters of right, to mere conjectures and possibilities; and, least of all, do courts of admiralty, in cases of salvage, yield themselves to imaginations of this sort. Salvors are not to be driven out of court upon the suggestion that if they had not touched a derelict ship and cargo, the latter might, in some possible way, have been saved from all calamity, and therefore, that the salvors have little or no merit."

Having satisfied my mind that the owners of the saving vessel are entitled to compensation and reward, I shall now proceed to determine the quantum of salvage to be allowed; and I may here remark that I cannot agree with the counsel of the owners in the estimate they have formed of the services rendered. It is true that this is a clear case of derelict, and I admit that in cases of this nature there are many precedents and high authorities for allowing a moiety to the salvors. Yet a review of these precedents and authorities will show that the rule is not inflexible; and the admiralty courts, both in England and in this country, have been governed in their decrees by the peculiar circumstances of each particular case. A candid consideration of the facts already detailed, has led me to regard the services rendered to the Charles as highly meritorious, but totally unattended by any peril to the salvors, and with little difficulty, save what they encountered in consequence of the gale they experienced in towing the ship to the Balize. After entering the Balize, no further impediment was offered by the winds; and the only obstacle that presented itself to their progress, was the current of the Mississippi river, which the tow-boat is required daily to encounter. The salvors were not even prevented from bringing up other vessels from the Balize, and were consequently subjected to no loss, and but little delay in following their usual occupation. And although there has been a valuable service rendered to the owners of the derelict vessel, it is yet difficult to meet with an instance of salvage, wherein those through whose agency it may have been effected have been subjected to so little actual loss, or so little personal difficulty and peril. In awarding compensation for services of this nature, while I cheerfully acknowledge the merit to which they are entitled, I am, at the same time disposed, in the language of Judge Hopkinson, in the case of Hand v. The Elvira [Case No. 6,015], "to teach the salvors that they may not stand ready to devour what the ocean may spare: that they must not be permitted to believe that they bring in a prize of war, and not a friend in distress." This view of the case would forcibly apply to the captain and pilot of the tow-boat, were they now before the court as claimants of salvage; and far more forcibly do they apply to the owners, who, in all the cases of this nature that I have examined, have been regarded as entitled only to a particular proportion of the whole quantum of salvage decreed. The ingenious proctors of the owners have contended for the rights of their clients upon a principle which, with due deference to the signal ability they displayed in the argument, I cannot recognize as the legitimate basis of the decree I am now called upon to render. They seem to think, that because the crew of the tow-boat Tiger have failed to make out their claim for salvage, and the captain and pilot have declined asserting a right to compensation for their services, they

(the owners) should receive a full moiety of the whole property saved, or the whole quantum of salvage which ought to be, or usually is decreed in such cases, to be divided among all the salvors. To the correctness of this principle I cannot assent. From the evidence upon which this case must turn, I cannot, in the first place, reconcile it to my ideas of strict justice, that a moiety ought to be decreed, even if the crew had proven the allegations of their libel, and the captain and pilot had also claimed as salvors. In the second place, I cannot adjudge the owners entitled to receive the portion which might have been claimed by the captain and pilot. This would be acting upon the principle of awarding to cupidity the portion which modesty had declined receiving.

From an attentive consideration of all the facts of the case, I am of the opinion that one-third of the value of the ship and cargo, would be not only a fair but a liberal quantum of salvage to be awarded to the crew, captain, pilot and owners, if they were all before the court, and had legally established their right to salvage. But, as the owners are alone to be rewarded, and as it is shown that they themselves have not been subjected to either difficulties or dangers, and that their property (the tow-boat) was not exposed to any danger in the service which she rendered to the Charles, I am of the opinion that the proportion of one-third of the whole quantum before mentioned, will be a fair and liberal compensation to be allowed them. In this opinion I am fully sustained by Judge Story, in the case of The Henry Ewbank, from which I have already made liberal quotations, and which I have adopted as my principal guide in deciding upon the merits of this case, both because his opinion must be regarded as of very high authority, and because the decision itself contains a full and able review of the various important cases, of a like nature, decided in this country, by our highest admiralty tribunals. "If I had been called," says he, "for the first time, to say what, under ordinary circumstances, should constitute the proportion of the owner, I might have hesitated; but I incline to think that it would have occurred to me that one-third would be a suitable proportion. But if I had found that proportion to have been adopted in other cases, and to have become in some sort a habit in our courts of admiralty, my own judgment would have reposed upon it with an undoubting confidence. Now, upon looking into the cases decided in the superior courts exercising admiralty jurisdiction, it appears to me that it will be found to have been, throughout, at least to some extent, a habit of these courts to award to the owner one-third of the salvage. That amount has certainly been not unusual in our most commercial districts, and especially in New York and Pennsylvania." See Concklin v. The Harmony [Case No.

3,089]; Bond v. The Cora [Id. 1,620]. My brother, Mr. Justice Washington, adopted it after grave examination, in the case of Bond v. The Cora [Id. 1,621]; and I find that it has prevailed more than any other rule in contested cases brought before the courts of the districts in which he presided. But what is of most powerful influence in this case, it was adopted by the supreme court in the case of Morris v. The Blaireau, 2 Cranch [6 U. S.] 240, 269, 271, after the fullest deliberation upon solemn argument. It seems to me that that case ought to furnish a guide for all subordinate courts under common circumstances. I do not say that the rule should be absolutely inflexible, and not yield to any extraordinary merits, or perils, or losses on the part of the owners. Cases may exist in which it may be quite fit to allow the owner one-half, as was done in several cases stated at the bar. But all such cases must stand upon very peculiar and pressing circumstances." By this decision I am prepared to abide, with the single remark that the peculiar and pressing circumstances therein mentioned, are not to be found in the facts of this case.

My next duty is to put an estimate on the ship and cargo; and I regret that the evidence does not furnish me with some safe guide in coming to a conclusion on this point. There were no appraisers appointed by the parties in interest, and I am therefore compelled to make as fair an estimate as I can from the ex parte appraisements of the ship, made at different times, at the request of the owners of the Tiger and the agent of the respondents. The first appraisers considered the vessel alone, worth the sum of $7,500; one of them (Gregory Byrne) states, that he considered this sum to be her value when she first returned to port, and that she depreciated in value afterwards, about $1,000. Mr. Spedden and Mr. Robinson considered her in the month of October, to be worth about $4,500, and the cargo to be worth $3,300, making both vessel and cargo worth the sum of $7,800. From an attentive review of the whole evidence, I am inclined to think that the first estimate was too high, and the last much too low, as far as related to the ship. The estimate placed upon the cargo, seems so nearly correct, that I am unwilling to interfere with it, especially as it seems from the date of the appraisement, to have been made during the last month. The value of the ship, should, I think, be estimated at $6,000; this is allowing $1,500 as the amount she depreciated in value after the first estimate, and the allowance, I think, is sufficiently liberal, notwithstanding the testimony of Mr. Whitney, that he made several efforts during the summer, to sell her for the sum of $4,000, and failed. I have no doubt, whatever, that his statement is strictly true; but in a deserted city such as this was during the prevalence of the epidemic,

and at a time too, when large cash prices could not be obtained for the best vessels, it is not surprising that the most strenuous efforts to dispose of her, should have proved unsuccessful. But this fact cannot be justly taken as a criterion, by which we are to find out her intrinsic value. She could not have so far depreciated in value, when we take into consideration the fact, that as soon as she was bonded, the agent of her owners considered her capable of performing a voyage to Europe, and that she was actually dispatched upon that voyage.

Before making the decree in accordance with the above estimate, I wish to observe, that I have maturely considered the facts set forth in the supplemental answer and claim, filed by the counsel of the respondents a few days before the final trial of the cause; and although I cannot but regard the conduct of one of the owners of the Tiger (Clark), as highly censurable, yet I cannot say that there is any fact connected with the negotiations for a compromise, which a court could legally consider a ground for refusing salvage to the party and mulcting him in the costs of suit. There has been no legal tender of a specific amount, by a deposit of the money in court, nor have the propositions for a compromise been so made as that they can now be made a matter of judicial cognizance. "In salvage cases," says Dunlap in his Admiralty Practice, "which are frequently of great importance, and where propositions of compromise are often ambiguously made, and often liable to misconception, the admiralty court in England, disregards all tenders, except those formally made by acts of court. It is not known that this doctrine has been adopted in the courts of the United States; but the general practice is, in salvage cases, to make tenders by formal acts of court, which are legal memoranda of the nature of pleas." Adopting this rule, which seems to be a safe and sound one, as my guide in this case, I cannot concur in the reasons urged by the proctor of the respondents, in support of the pleas set up in his supplemental answer and claim. Besides, the detention of the vessel cannot be said legally, to have been caused by the owners of the Tiger, when the record of the case shows that she was in the custody of the marshal, at the suit of the crew, before the written proposition for a compromise relied upon by the proctor for respondents, was made.

It is therefore ordered, adjudged and decreed that the owners of the Tiger do recover from the respondents and claimants of the ship Charles and her cargo, the one-ninth of the sum of $9,300, and the sum of $30, paid by the captain of the Tiger, to the six hands taken from the ship Powhattan to pump out the ship Charles, and also the sum of six dollars, paid by the said owners for taking care of her in port. And it is further ordered, adjudged and decreed that the said respondents and claimants pay the costs of suit.